ESTATE OF ELLA B. HOLLINGSWORTH, DECEASED, MARY JANE H. CROLLEY, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hollingsworth v. Commissioner
Docket No. 26186-82.
United States Tax Court
T.C. Memo 1987-95; 1987 Tax Ct. Memo LEXIS 91; 53 T.C.M. (CCH) 163; T.C.M. (RIA) 87095; February 17, 1987. Mary Jane H. Crolley (specially recognized for the petitioner). Charles P. Hanfman, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the income tax of Ella B. Hollingsworth for the calendar year 1964 in the amount of $406,941.79. The issue for decision is whether Mrs. Hollingsworth received $548,170 of funds from a break-in at the plant of her estranged husband, John D. Hollingsworth, during the year 1964, which sum she converted to her own use. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Ella B. Hollingsworth (decedent), who died on September 15, 1984, was a resident of Greenville County, South Carolina on the date of the filing of her petition in this case. Mary Jane H. Crolley is the daughter of decedent *92 and was named in decedent's will as her heir and her executrix. Decedent's will has not been probated and no estate has been opened because there are no assets in decedent's estate with the possible exception of a $2,000 refund of Federal income tax for the year 1966. Decedent filed her 1964 Federal income tax return with the Internal Revenue Service Center, Altanta, Georgia. On that return she reported interest, rental income, long-term capital gain and income from court ordered support. Mrs. Crolley was born on August 7, 1945. As a child, she at times lived with her mother and father and at other times with an aunt in Greenville, South Carolina. She attended school at Ashley Hall, Charleston, South Carolina for 2 years. In 1960, when she was 14, she had graduated from high school and was attending the University of Miami, Miami, Florida. In 1962, she received her degree from the University of Miami and enrolled in some graduate courses in 1963. In June of that year she began taking graduate courses at the University of Iowa, Iowa City, Iowa. John D. Hollingsworth, decedent's ex-husband and Mrs. Crolley's father, owned and operated a multimillion dollar international textile *93 machinery business during the year 1964 and for a number of years prior and subsequent to 1964. The business was operated in a plant known as Hollingsworth on Wheels (hereinafter sometimes referred to as the Hollingsworth plant or the plant). For some years prior to 1964, John D. Hollingsworth had the habit of keeping large amounts of cash in bags which he would refer to as "swimsuits". Generally he kept this cash with him wherever he was. Both decedent and Mrs. Crolley knew that Mr. Hollingsworth kept large sums of cash in a suitcase. Mrs. Crolley often had seen him take the suitcase with the cash in it into his bedroom in the evening and take it back with him to the plant when he would return to work in the morning. In 1962 decedent was working at the plant with Mr. Hollingsworth. He very often wrote her various types of notes, some of them, particularly ones written in late 1962 and in 1963, accused her of various activities which he considered detrimental to his interests. On December 1, 1962, Mr. Hollingsworth wrote a note to decedent which stated: Empty swim suit containers are in my office bathroom. The swim suit itself is safe elsewhere known only to me. Some *94 of the notes written by Mr. Hollingsworth to decedent appeared to accuse decedent of taking money from the business for the benefit of her relatives and demanded that decedent account for such money. From sometime in 1944, approximately 3 years after their marriage, until March of 1966, decedent had a general power of attorney from Mr. Holingsworth permitting her to write checks on his bank accounts and otherwise transact in her name any business that he might otherwise transact. Although there had been arguments between the two of them, starting in late 1963 when they were having domestic troubles, about decedent's writing checks on the company bank account, this general power of attorney to decedent was not terminated until 1966. By January 1964, decedent and Mr. Hollingsworth had separated and decedent was living in the house where she and Mr. Hollingsworth had previously lived which was located a few blocks form the Hollingsworth plant. Mr. Hollingsworth was living in a trailer on the plant grounds. In late March or early April 1964, Mrs. Crolley (then Mrs. Farrell) came to decedent's home in Greenville from Iowa City, Iowa, where she was attending graduate school and brought *95 her young baby with her. Jeffrey Farrell was at that time Mrs. Crolley's brother-in-law. In early April 1964 he came to Greenville. At the request of her then husband, Mrs. Crolley agreed to have Jeffrey Farrell drive with her to Florida. While he was in Greenville, Jeffrey Farrell stayed at decedent's home. Theodosia Kuper had been a close friend of decedent's for a number of years prior to 1964. Between 1960 and 1962, she worked at the Hollingsworth plant and between 1962 and 1964, worked for decedent and Mr. Hollingsworth personally. She performed a number of tasks for decedent and Mr. Hollingsworth, including, at times, picking up large amounts of cash for them in Miami and bringing the cash back to the plant in Greenville. She also, on some occasions, personally assisted members of the Hollingsworth family. At one time she stayed with Mrs. Crolley and her baby, Kathleen, in Miami. On April 6, 1964, Mr. Hollingsworth reported to the Greenville police and the County Sheriff that a break-in had occurred at his plant, Hollingsworth on Wheels, in Greenville, South Carolina sometime prior to 1:00 a.m. on April 6, 1964. He reported the items missing as a metal typewriter *96 case; an imitation leopard skin overnight bag; a leather woman's overnight bag; a leather diary, JDH 1963; a leather diary, JDH 1964; a white envelope containing checks from customers; a white envelope containing records; a brown envelope containing records, addressed by hand to Mr. Walker; a lot of proof coins -- 89 sets 1961, 81 sets 1962; a key ring with 6 to 8 keys; a stopwatch, Security brand; and a Minox camera. He did not report any cash as having been taken from the plant. On January 6, 1965, Mr. Hollingsworth reported to the police that a large amount of money had been stolen from his plant during the April 5 or 6, 1964 break-in. Following this report, State and local police officers contacted Mrs. Kuper in Mexico City, Mexico, where she had gone in connection with a position with a church. After extensive questioning of her, they requested that she return with them to the United States, which she did. During the time she was in Mexico and after she returned to the United States, Mrs. Kuper gave three separate statements to police with respect to the break-in at Mr. Hollingsworth's plant. On May 10, 1965, Jeffrey Farrell pleaded guilty to housebreaking and larceny in *97 regard to the break-in at the Hollingsworth plant. He received probation and a suspended sentence. He gave a statement to local law enforcement officials implicating decedent and Mrs. Crolley in the break-in. On September 3, 1965, Mrs. Kuper pleaded guilty as an accessory after the fact to housebreaking and larceny in reference to the break-in on April 5 or 6, 1964 at the Hollingsworth plant. She received probation and a suspended sentence. Decedent and Mrs. Crolley were each indicted for housebreaking and grand larceny by a local court in Greenville, South Carolina. A trial was commenced and, after John D. Hollingsworth refused to testify, the jury was instructed to find the defendants not guilty, and they were found not guilty pursuant to a directed verdict. After decedent and Mrs. Crolley were found not guilty, the guilty pleas of Jeffrey Farrell and Mrs. Kuper were set aside and they were granted new trials. They were never retried. Prior to the break-in at the Hollingsworth plant, decedent and Mr. Hollingsworth were involved in several suits stemming from their marital relationship. Decedent, after her separation from Mr. Hollingsworth, had brought an action for support *98 and Mr. Hollingsworth had brought an action against her for divorce. There were also disputes between them involving the operation of the business, Hollingsworth on Wheels. After her acquittal by directed verdict, Mrs. Crolley brought a suit for malicious prosecution against her father, Mr. Hollingsworth, in the United States District Court of South Carolina, Greenville Division. On March 3, 1969, decedent, Mrs. Crolley and Mr. Hollingsworth entered into an agreement to settle all these various suits. This agreement provided in part as follows: WHEREAS, Mrs. Farrell (Mrs. Crolley) is the plaintiff in an action against Mr. Hollingsworth, as defendant, pending in United States District Court for the District of South Carolina, Greenville Division, Civil Action No. 66-479; and WHEREAS, Mr. and Mrs. Hollingsworth are parties to domestic relations litigation in the Juvenile and Domestic Relations Court of Greenville County, South Carolina; and WHEREAS, the Internal Revenue Service is conducting an investigation of the Federal income tax liabilities of Mr. and Mrs. Hollingsworth for the year 1960 through 1963 and is asserting penalties with respect to their Federal income tax *99 liabilities for such years * * *. 1. Mr. Hollingsworth agrees to pay $150,000.00 to Mrs. Farrell as follows: (a) $25,000.00 has been paid in cash, the receipt and sufficiency of which are hereby acknowledged by Mrs. Farrell; (b) The remaining $125,000.00 shall be paid to Thomas A. Wofford and Henry Hammer, as escrow agents for Mrs. Farrell, in such manner and form as said escrow agents determine will provide cash in said amount to be paid to Mrs. Farrell within a reasonable period of time. 2. Mrs. Farrell has executed and delivered to Mr. Hollingsworth a consent to an order of dismissal with prejudice of said Civil Action No. 66-479, copy of which is attached hereto as Exhibit A, and a mutual release relinquishing and waiving claims against Mr. Hollingsworth, a copy of which release is attached hereto as Exhibit B. 3. Mr. and Mrs. Hollingsworth have executed and delivered the mutual release relinquishing and waiving the claims of each against the other, attached hereto as Exhibit B. 4. Mr. and Mrs. Hollingsworth have executed a consent to a Decree, a copy of which is attached hereto as Exhibit C, to be entered in said domestic relations litigation, which Decree provides *100 for a full and final lump sum settlement of $200,000.00 to be paid by Mr. Hollingsworth to Mrs. Hollingsworth in installments as follows: (a) $10,000.00 upon granting of said Decree; (b) $10,000.00 on April 1, 1969; and (c) Nine (9) semi-annual installments of $20,000.00 each beginning on October 1, 1969. 5. Mrs. Hollingsworth agrees to visit and consult with Dr. Bernard Holland, head of the Section of Psychiatry of the Emory University Clinic and Chairman of the Department of Psychiatry of the Emory University School of Medicine, to the extent reasonably deemed desirable by him in determining the mental and emotional condition of Mr. and Mrs. Hollingsworth as it relates to their income tax returns for the years 1960 through 1963. 6. Mrs. Hollingsworth hereby authorizes Dr. Holland or members of his staff to consult with any other physicians or psychologists whom she has consulted or interviewed, either with Mr. Hollingsworth or alone, where deemed by Dr. Holland relevant to his evaluation of the mental and emotional condition of Mr. and Mrs. Hollingsworth; and Mrs. Hollingsworth hereby authorizes any such other physicians or psychologists to disclose to Dr. Holland or *101 members of his staff any information such other physicians or psychologists have obtained from Mrs. Hollingsworth or others which is relevant to Dr. Holland's evaluation. 7. Mrs. Hollingsworth hereby authorizes the utilization of the results of Dr. Holland's evaluation, including any information obtained by Dr. Holland in connection with his evaluation, by Mr. Hollingsworth's attorneys to the extent relevant in resisting or attempting to defeat the penalties asserted by the Internal Revenue Service against Mr. and Mrs. Hollingsworth or either of them with respect to their income tax liabilities for the years 1960 through 1963 * * * After the settlement was entered into the parties signed mutual releases, each releasing the other from any further liability in connection with the subject matter of these suits. For most of the time following 1964, decedent lived either next door to or with her daughter, Mrs. Crolley, and Mrs. Crolley's family. She lived modestly and did not spend large sums of money or give lavish gifts. From 8:00 or 8:30 p.m. on April 5, 1964, up through 1:30 a.m. on April 6, 1964, decedent and Mrs. Crolley were sitting in decedent's living room watching *102 television shows with a friend of decedent's, Bertha Lee Lowry. Initially Jeffrey Farrell was sitting in the room with them, but at approximately 10:00 p.m. he went into his bedroom. They only saw him once again during that evening, which was around midnight or shortly thereafter, when he came from his bedroom door through the living room into the kitchen to get something to drink. At around 1:30 a.m., decedent went to her bedroom for the evening and Mrs. Crolley went to her bedroom where she spent the rest of the evening. Respondent in his notice of deficiency issued on August 2, 1982, to decedent increased her income, as reported, by $548,169.70 with the following explanation: It is determined that during the tax year ended December 31, 1964 you received funds in the amount of $548,169.70 from your former husband, Mr. John D. Hollingsworth, which you converted to your personal use so as to make such funds taxable under section 61 of the Internal Revenue Code. Inasmuch as you failed to report any of such funds in your income tax return for 1964, your taxable income for that year is increased in the amount of $548,169.70. OPINION The issue here is purely *103 factual. Since respondent determined that decedent took $548,169.70 from her former husband in 1964, which she converted to her personal use, it is incumbent on petitioner to prove to the contrary. The testimony of Mrs. Crolley was offered on behalf of decedent. The Government's contention, as explained during the trial, was that money had been stolen from the premises of Hollingsworth on Wheels on the night of April 5 or early morning of April 6 and had been given to decedent and she had retained it. Mrs. Crolley testified that she and decedent and a friend, Mrs. Lowry, and later Mrs. Lowry's son, were in decedent's home watching T.V. from approximately 8:00 to 8:30 p.m. on April 5 to 1:30 a.m. on April 6, and then she went to bed and decedent went to her bedroom. Mrs. Crolley testified that Jeffrey Farrell was also in the house and went to his bedroom at around 10:00 p.m. He later came through the living room at sometime around midnight or shortly thereafter and then went back to his bedroom. Although Mrs. Crolley stated that she considered it unlikely that he could have left the house without her seeing him, since to leave his bedroom and go out it would be necessary to come *104 through the living room, it could have been possible for him to leave through a window. She did not think he had done this. In any event, if we believe Mrs. Crolley's testimony, which we do, neither she nor decedent were involved or could have been directly involved in the theft of money from the Hollingsworth on Wheels plant on the evening of April 5 or early morning of April 6, 1964. The balance of the record clearly supports Mrs. Crolley's testimony. No alleged theft of money was reported by Mr. Hollingsworth to the police until January 6, 1965, 9 months after the alleged break-in. There is no explanation of why, if in fact money was taken during the break-in and if in fact a break-in did occur on the night of April 5 or early morning hours of April 6, the loss of the money was not reported until January of the following year. There were domestic disputes and the various suits between decedent and her then husband, Mr. Hollingsworth, at the time of the claimed break-in. The indication from this record is that Mr. Hollingsworth's claim that decedent, with the assistance of their daughter, Mrs. Crolley, stole money from the Hollingsworth on Wheels plant is a continuation of *105 these various disputes. The directed verdict in the criminal case against decedent and Mrs. Crolley after Mr. Hollingsworth's refusal to testify is a further indication that decedent did not take the money respondent has determined that she took. There is no explanation in this record of why his testimony was necessary to permit the case to go to the jury. The break-in at the Hollingsworth on Wheels plant was reported on April 6, 1964, the morning after it is claimed it occurred. At that time, no money was included in the items listed as taken. Mr. Hollingsworth apparently had no direct information as to who broke into the plant. It would appear that if there was sufficient evidence to prove a case against decedent and Mrs. Crolley, it would have been from sources other than Mr. Hollingsworth's testimony. Also, the fact that the guilty pleas of Mrs. Kuper and Jeffrey Farrell were withdrawn by the court, and they were never tried after the directed verdict acquitting the decedent and Mrs. Crolley indicates that the circumstances of these pleas were questionable. Finally, there was a settlement of Mrs. Crolley's suit for malicious prosecution against Mr. Hollingsworth and, as *106 part of the settlement, Mr. Hollingsworth paid her $150,000. At this same time, the domestic and divorce problems between decedent and Mr. Hollingsworth were settled and decedent was paid some $200,000 by Mr. Hollingsworth. All of this seems most unlikely if Mr. Hollingsworth really believed decedent had taken some $548,000 from Hollingsworth on Wheels. Furthermore, at the time the claim was made that decedent took these funds, she had a power of attorney to withdraw funds from Mr. Hollingsworth's accounts and otherwise to sell and dispose of his property. Had she been attempting to obtain his funds, it is far more likely she would have done so by use of this power of attorney than by stealing cash. Finally, the record shows that decedent left no estate at the time of her death and that from the mid-60's until the time of her death, she lived primarily with her daughter, Mrs. Crolley, and her family and lived most frugally. This again is an indication of no hidden or misappropriated $548,169.70. With this evidence on the part of petitioner, which clearly indicates to the Court that decedent did not appropriate or steal from her husband $548,169.70 in 1964, respondent in rebuttal *107 offered the testimoney of Theodosia Kuper. Her testimony was contradictory and for the most part unbelievable. She was sure that the night she was asked to receive funds from decedent and take the funds over to a motel until somebody picked them up was Easter Sunday night. April 5, 1964, was the Sunday following Easter Sunday. Her testimony was contradictory about whether she received any of the funds, about a key to the Hollingsworth plant office, and in other respects. It is unrealistic to believe that if Mrs. Crolley, with the help of Jeffrey Farrell, had stolen money from Hollingsworth on Wheels and given this money to decedent, they would have asked a friend of decedent, such as Mrs. Kuper, to take the money and keep it in a motel overnight. The testimony, that decedent and Jeffrey Farrell came down the next morning and put the money into different suitcases which they told Mrs. Kuper to give to some unidentified woman, is equally unbelievable. If in fact decedent, Mrs. Crolley, and Jeffrey Farrell had obtained the money, there is no logical reason they would have turned it over to Mrs. Kuper. Jeffrey Farrell and Mrs. Crolley were leaving late on April 6 to drive to Florida *108 and could very well have delivered the money wherever decedent wanted it before they left. There is no logical reason shown in this record of why Mrs. Kuper would have been asked to participate in the concealing of the money. Mrs. Kuper's testimony was totally unbelievable and we do not accept any of it. Therefore, this record is left with testimony clearly indicating that decedent did not receive the money respondent contends she received in 1964. In passing, we must note that the notice of deficiency was not issued until March of 1982 for the taxable year ending December 31, 1964. There is no explanation in this record of why it took respondent 18 years to decide to issue a notice of deficiency to decedent. Apparently, from statements made in the record, decedent did grant extensions of time to respondent up through the time the notice of deficiency was issued. However, it is difficult to understand why it took respondent some 18 years to decide that decedent did misappropriate or steal funds from her husband in 1964. We believe Mrs. Crolley's testimony to the effect that she did not participate in the theft of such funds and that decedent did not receive such funds from *109 anyone who did. We do not believe Mrs. Kuper's testimony. Decision will be entered for the petitioner.